1   **FABIO KRISHNA PERIERA**
2   125 WEST 123 STREET, APT. L-1
    NEW YORK, NY 10027
3   917 260 9823 | 424 253 5231
    fabio@alumni.bates.edu
4
5           UNITED STATES CIRCUIT COURT
            SOUTHERN DISTRICT OF NEW YORK
6
7   FABIO KRISHNA PERIERA, *PRO SE*     Case No.: **18-cv-620**
8                                        *COMPLAINT FOR*
            Plaintiff,                    Violations of:
9                                         Fourth Amendment,
    vs.                                   Thirteenth Amendment,
10                                        45 CFR 50.204-205,
11  CREATIVE ARTISTS AGENCY, BC          18 USC § 372
    STRATEGY LTD., CHURCH OF             18 USC § 373,
12  SCIENTOLOGY, TOMER HALFON, JENNA     18 USC § 472,
    ROSE KLATCHO, ASHLEY HASZ, KEVIN     18 USC § 475,
13  HUVANE, JEFFREY MORRONE & JOHN       18 USC § 1593A,
    AND JANE DOES 1 THROUGH 50           18 USC § 2261A,
14  INCLUSIVE.                           18 USC 63 § 1341,
15                                        18 USC 63 §1342,
            Defendants                    18 USC 63 §1343,
16                                        18 USC 63 §1344,
17                                        18 USC 63 § 1346,
                                          18 USC 96 § 1961-68,
18                                        22 USC § 4101,
19                                        42 USC § 1982,
                                          42 USC § 1983,
20                                        42 USC § 1985,
                                          42 USC § 1986
21
22
23
24              **PRELIMINARY ALLEGATIONS**
25      1.      Plaintiff is a United States citizen, and is and was at all times material herein, a
26  resident of the County of New York, State of New York.
27      2.      Plaintiff is informed and believes and based thereon alleges that at all times
28  relevant herein that, named Defendant, Creative Artists Agency ("Creative Artists Agency" or

"CAA") was and is a Delaware Corporation doing business in the State of California, County of Los Angeles, as well as foreign corporation doing business in the State of New York, Counties of New York, Kings, Queens, Staten Island and the Bronx, with offices at 405 Lexington Ave, 19 FL, New York, New York 10174.

3.     Plaintiff is informed and believes and based thereon that at all times relevant herein that, named Defendant, BC STRATGY LTD ("BLACK CUBE") was and is an Israeli Corporation doing business in the United States, as well as holding offices in Paris, France, and London, United Kingdom, with headquarters in Tel Aviv, Israel, and a postal address of 3 Mazeh Street, Tel Aviv, Israel.

4.     Plaintiff is informed and believes and based thereon that at all times relevant herein that, named Defendant, CHURCH OF SCIENTOLOGY was and is an American non-profit corporation doing business in the United States, with headquarters at 6331 Hollywood Boulevard, Los Angeles, CA 90027.

5.     Plaintiff is informed and believes and based thereon that at all times relevant herein that, named Defendant, JENNA ROSE KLATCHKO was and is a United States citizen doing business as an adjunct of Creative Artists Agency.

6.     The true names and capacities, whether corporate, associate, individual, or otherwise, of Defendants Does 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Each of the Defendants designated herein as a Doe is negligently, intentionally, or otherwise legally responsible in some manner for the events and happenings herein referred to and caused injuries and damages proximately thereby to the Plaintiff, as herein alleged. Plaintiff will ask leave of court to amend this complaint to show their names and capacities when the same have been ascertained.

7.     At all times relevant herein, each Defendant designated, including Does 1 to 50, herein was the agent, partner, joint venturer, representative, servant, employee and/or co-conspirator of each of the other Defendants, and was at all times mentioned herein acting within

2

the course and scope of said agency and employment, and all acts or omissions alleged herein were duly committed with the ratification, knowledge, permission, encouragement, authorization and consent of each Defendant designated herein.

## JURISDICTION

8.      Though actions giving cause to this lawsuit have occurred in Los Angeles, California; New York, New York; the State of New Jersey; Washington, District of Columbia; Silver Springs, Maryland; Alexandria, Virginia; Arlington, Virginia; Dulles, Virginia; and London, United Kingdom, including in transit between New York, New York, and London, United Kingdom; the Plaintiff believes the venue is proper in the Southern District of New York.

## FACTS

9.      Mr. Periera is an exemplary consultant for the International Bank for Reconstruction and Development, more commonly known as the World Bank (World Bank), protected by the International Organizations Immunities Act of 1945. Mr. Periera does not waive his right of immunity from countersuit by all Defending parties.

10.     Early in his employment at the World Bank, which began in February 2015, the Defendant began sending Mr. Periera sexually suggestive images and emails, first by way of JEFFREY MORRONE. Mr. Periera had not had a relationship with Mr. Morrone since approximately 2011, though in prior conversations between Mr. Periera and Ms. Klatchko, Mr. Morrone's name had been floated as a potential talent manager for Mr. Periera's former career in the media industry.

11.     Neither CAA nor Mr. Morrone has ever had a contractual business relationship with Mr. Periera, though Mr. Periera did sign a Submission Release Agreement on May 18, 2012 allowing CAA the opportunity to read a creative work produced by Mr. Periera and consider it for the purposes of selling it. This agreement has since lapsed and is no longer in effect. In fact,

3

in June 2012, CHRIS LAWSON, an executive at CAA informed Mr. Periera by email that he was a 'non-client.'

12.     Though CAA has been engaged in a systematic campaign to destroy Mr. Periera's career since 2010, while employed at the World Bank, the Defendants began a pattern of electronic harassment that falls within the definition of wire fraud, for the purposes of the RICO statute, intended to not only damage Mr. Periera's career at the World Bank but also force Mr. Periera to adopt and advocate for political positions other than his own, under threat of death. The Defendants, and principally CAA and the Church of Scientology assert that Mr. Periera is a 'sex slave' and is the property of DEFENDANT HUVANE, a senior executive at CAA.

13.     Prior to Mr. Periera's employment, the Defendants attempts at harassment largely constituted two methods, honest services fraud and defamation. As to the first, ASHLEY HASZ made continuous false representations to the Plaintiff, designed specifically to extort money Mr. Periera had won in an employment action against *The Hollywood Reporter*, an entertainment industry publication and a business ally of CAA. Secondly, the Plaintiff's had engaged the services of TOMER HALFON, an Israeli national, in approximately July 2012, to spread malicious rumors around the entertainment industry, where Mr. Periera worked at the time, that Mr. Periera had intentionally infected Mr. Halfon with HIV. Mr. Periera is HIV-positive but has remained undetectable, and thus scientifically unable to transmit the virus, since 2010 and remains so to this day.

14.     Beginning approximately at the same time Mr. Periera began working for the World Bank in 2015, the Defendants' harassment included illegally accessing Mr. Periera's cell phone to harass and threaten him, as well as the use of "remote neural monitoring" – a new commercial technology allowing for non-consensual direct messaging and data mining to and from the human brain using electromagnetic waves emitted by Wi-Fi, cellular and satellite technologies – to harass and harm Mr. Periera, while also putting the general public at substantial risk by also illegally accessing public address systems, inclusive of those on the Washington, DC

and New York City Subway systems, to harass and encourage violence against Mr. Periera. There are currently several brands offering remote neural monitoring technologies to the public including Emotiv, Facebook and others.

15.     EXHIBIT A contains a near daily log of the Defendants' harassment of the Plaintiff.

16.     As a result of this harassment, and because of its ability to cause harm to the general public, Mr. Periera's contract with the World Bank was terminated in June 2015, having only weeks before been extended due to his excellent performance at his job.

17.     To wit, despite his remunerative contract having been terminated by the World Bank, Mr. Periera represented the World Bank and the United States, as a voting delegate, at a High-Level Meeting chaired by the President of France during the 2016 United Nations General Assembly, and continues to represent the World Bank and participate within the United Nations System to the present date.

18.     This has only generated further harassment, including death threats and entreaties to commit suicide, from the Defendants.

19.     For example, during the 2016 UN General Assembly, the Defendants, having spent the better part of the week leading up to the event telling Mr. Periera that they 'could not allow him to go to the UN General Assembly' illegally accessed the translation system in the room where Mr. Periera was doing his job to demand that Mr. Periera turn over 'ten percent of all your income.' This action was met with shock by all participants in the High-Level Meeting.

20.     At the time of his loss of remuneration from the World Bank, Mr. Periera was also an graduate student in the part-time Executive Master of Public Administration (EMPA) program at Columbia University, School of International and Public Affairs ("SIPA").

21.     Contiguously, the Defendant fabricated a representation of its relationship with Mr. Periera to his graduate university administrators. For example, at the Fall 2015 SIPA Open House on or about September 2015, an unnamed executive from CAA, JOHN DOE 1, was

5

witness to a confrontation between Mr. Periera and a SIPA administrator regarding Mr. Periera's disappointment that CAA executives were, essentially, being allowed to guide and control Mr. Periera's education, without his implicit or explicit consent, resulting in the denial of access to courses Mr. Periera wanted to enroll in. For example, during the Spring 2016 semester, Mr. Periera wanted to enroll in Law and Development at Columbia Law School, taught by Katerina Pollit. Columbia Law School usually waives its full-time student requirement for SIPA EMPA students, Mr. Periera's application, though approved by Ms. Pollit, was denied by Columbia Law School. Subsequent admissions by the Defendants have made it clear that this was intentional, so as to deny Mr. Periera the tools by which he might defend himself against their racket.

22.     The Defendants also took other actions by which they sought to enslave Mr. Periera.

23.     For example, during the Spring 2016 term, Mr. Periera was the original recipient of the Andrew Wellington Cordier Award, which entitles the recipient to publication in the prestigious *Columbia University Journal of International Affairs*. During the course of editing his award-winning submission, Mr. Periera's computer was hacked and the contents of its hard drive destroyed, resulting in Mr. Periera losing his award by having missed its final submission deadline. Importantly, the topic of the essay was Iraq terrorism within the context of the Middle East's security complex and made an unpleasant, though factually accurate, reference to the State of Israel.

24.     Equally as important, BC Strategy Ltd. (Black Cube) is entirely comprised of intelligence officers from the State of Israel. Because the activities of Black Cube described herein amount to commercial engagement within the United States, any immunity from prosecution they might have enjoyed under the Foreign Sovereign Immunities Act is void.

25.     As reported in *The New York Times*, *The New Yorker* and elsewhere, Black Cube has an established reputation for intimidation and illegal behavior on behalf of the disgraced film producer Harvey Weinstein, who in *Harvey Weinstein v. Central Intelligence Agency*, Case

6

2:2017cv07940 in the Central District of California, not only had his assets frozen but was also denied a writ of habeus corpus. On behalf of the Church of Scientology, the Defendants have, at times, claimed that Black Cube is working on either their and/or CAA's behalf.

26.     However, because of Mr. Periera's status as an International Affairs Consultant to the World Bank, Defendants demands have not only included demands of sexual slavery, but also feature political demands in violation of both Mr. Periera's rights as a US citizen and the Foreign Corrupt Practices Act, to which he is subject to under the terms and conditions of his employment with the World Bank.

27.     Statements from the Defendants executives have consistently asked Mr. Periera to hand over intellectual property he has created to CAA and Black Cube executives as it pertains to the entertainment industry; Defendants have expressly stated that rather than engage in a contractual business relationship they would ruin Mr. Periera's life and extort his intellectual property. 'This is how you get rid of a client you don't like,' Defendant JOHN DOE 1 says on January 3, 2017, 'by getting them to commit suicide.'

28.     Further, Church of Scientology executives have consistently made the claim that their goal is to return Mr. Periera to California, where he was born, 'in a body bag' as a murder-for-hire on behalf of CAA executives.

29.     Ultimately, the award itself was rescinded for Mr. Periera having missed the final submission deadline as a result of his destroyed computer. Further, the Defendants have not stopped trying to destroy either Mr. Periera's computer or the data he owns; on January 8, 2018 at 14:47 PM, Microsoft alerted Mr. Periera that someone had tried to access his cloud storage account and delete copious amounts of Mr. Periera's creative and professional work. Defendants have subsequently admitted fault, the action furthering their conspiracy to deprive Mr. Periera of his life while retaining his assets for pilfering and profiteering.

30.     Subsequently, on 13 December 2017, the Defendants have admitted that the destruction of Mr. Periera's computer was intentional, knowing that it would result in Mr.

Periera experiencing a loss of professional standing and further opportunities for peer reviewed publication, a key component of success in a credential and academically driven institution like the World Bank and, indeed, to the specific work Mr. Periera does in risk analysis for conflict, financial inclusion, gender equity and climate change.

31.     In March 2016, Mr. Periera, knowing the sequence of actions that led to the withdrawal of the Andrew Wellington Cordier Award, withdrew from SIPA. At the time, in addition to duties as a World Bank consultant, Mr. Periera was a student employee of Columbia Law School and was retained despite the termination of his relationship with SIPA through April 2016.

32.     In the months that followed, the Defendants continued a pattern of harassment designed to end Mr. Periera's life. This included using remote neural monitoring to encourage Mr. Periera to, for example, jump in front of oncoming subways cars, isolate Mr. Periera from friends and family and also dissuade employers from hiring Mr. Periera.

33.     During this time, the Defendants consistently asserted that not only is Mr. Periera a 'sex slave' but that he is only allowed to have sex with the Defendant's executives or those executives to whom he is offered.

34.     Mr. Periera has documented the consistent harassment by the Defendant which continues to the present day.

35.     Sexual harassment and sex trafficking makes up a large concern of the Defendants. Mr. Periera, a gay man, is harassed on a daily basis with regards to his sexuality. For example, while masturbating the Defendants repeatedly asserts that Mr. Periera should 'try thinking of a woman this time.' The Defendants continues to assert, against all reason, that his actions constitute 'saving' Mr. Periera from his homosexuality which in their view is the source of all of his problems. Further, the Defendants continues to assert that Mr. Periera should present himself to the public as a heterosexual man for the purposes of employment. The Defendant also claim that Mr. Periera's failure to present himself as heterosexual will result in the Defendant killing

8

Mr. Periera.

36.     The Defendants have consistently maintained that Mr. Periera will comply with their demands because the Defendants are in possession of information that could, upon public release, be damaging to the Plaintiff's career—information that primarily concerns the affairs of other members of the Plaintiff's family. The Defendants have banked on using this information as a way to discredit any claims made by Mr. Periera, as well as a way to ensure that Mr. Periera's future career opportunities are cut short by privately defaming the Plaintiff to any and all potential employers. This has been the basis for the Defendants trying to extort anything of value out of Mr. Periera and for their denigrating treatment of him with the intent that, despite his many accomplishments, he should be the Defendants property and sex trafficking victim, disposed of at their will.

37.     For example, the Defendants try, on nearly a daily basis, to force Mr. Periera to turn over the entirety of his estate to them. His refusal to do so has resulted in death threats from the Defendant. As stated earlier, the Defendant also assert that as a 'sex slave' Mr. Periera should take his own life when Defendant HUVANE is through with him. A common refrain was 'We offered you a part committing suicide. You wouldn't take it.' When asked for clarification – as to whether this was a reference to a, say a film role involving someone committing suicide, the Defendants confirmed, as of January 3, 2018, that their express meaning was that they desired Mr. Periera to commit suicide.

38.     Though no contractual business relationship has ever existed between Mr. Periera and the Defendant, Mr. Periera nonetheless went through the formal process of terminating an agent-artist relationship, as defined by law. This entails sending a certified first-class letter of termination to a given employment agency. A certified letter was sent on June 18, 2016, and received and signed for by Indra Modula at CAA's offices in New York. A copy of said correspondence is attached hereto as EXHIBIT B.

39.     Claiming that Mr. Periera 'needed punishment,' the Defendants have also

intentionally defrauded Mr. Periera of nearly $3150.

40.     On October 29, 2016, the Defendants used the AngelList online platform to offer Mr. Periera a job as an assistant to a fictitious art gallery called Hermoso Artistry. Mr. Periera was led to believe he would be processing orders of prints from a website, which he was also to design, maintain and publish.

41.     When the first 'order' arrived, a fictitious check was sent via US postal mail to Mr. Periera who was then told to deposit the check in his personal account – against the advice of Mr. Periera who offered to setup a corporate account for the business.

42.     The deposit of funds into Mr. Periera's account caused it to be overdrawn by the amount listed above.

43.     A fraud investigation was opened by Bank-Fund Staff Federal Credit Union on November 21, 2016, with case number 20267.

44.     Copies of correspondence between Mr. Periera and the fictitious person, who in truth was one of Does 1 through 50, is being subpoenaed from Bank-Fund Staff Credit Union.

45.     The Defendants have repeatedly admitted to illegally accessing Mr. Periera's computer to eradicate all traces of the fraud perpetrated against him.

46.     Mr. Periera intends to subpoena other records from Bank-Fund Staff Federal Credit Union detailing the Defendant's fraudulent activity.

47.     In their subsequent harassment of Mr. Periera, the Defendant have openly admitted their guilt for this fraud and further that it was an intentional and malicious action because the Mr. Periera refused to assist the Defendant in opening an account with the Bank-Fund Staff Federal Credit Union, whose membership is restricted to former employees of the World Bank and the International Monetary Fund and their immediate family members.

48.     Throughout 2017 and to the present day, the Defendants have consistently interfered with the affairs of the Plaintiff, especially as he leverages his credentials to generate income elsewhere. The Church of Scientology in particular has a long criminal history with

actions parallel to those undertaken in the present case. Of particular interest would be United States v. Mary Sue Hubbard et al., 493 F. Supp. 209 (D.D.C. 1979) which details a campaign of espionage activities against the United States Government with 5,000 agents across 136 government agencies, embassies and consulates committing wiretapping, theft and infiltration. Similar cases in which civil litigants have found damages against the Church of Scientology have been on charges of human trafficking, forced labor, [*Claire and Mark Hadley v. Church of Scientology, Int.* fraud, misrepresentation and libel [*Hill v. Church of Scientology of Toronto*]. – nearly all causes of action in the present case

49.     This has included illegally accessing the phone line on which Mr. Periera is speaking to offer up harmful rumor and speculation so as to dissuade employers and contractors from working with Mr. Periera—so Mr. Periera can focus on killing himself at the behest of the Defendants.

50.     Consistent statements against Mr. Periera's character label him as a terrorist, murderer and child molester. These statements are offered without proof and with the intent to cause harm to Mr. Periera's reputation. Many of the statements also made by the Defendants in harassing Mr. Periera point to underlying racial sentiments and motivations being a driving force in sustaining the harassment and intentional imposition of Mr. Periera.

51.     The racial, political and social animus caused by the intentional defamation of Mr. Periera is then used a pretext for, assuming the Defendants wish to proffer honest services after all, extorting either money, assets or sexual demands from Mr. Periera, in addition to reminders that Mr. Periera must either comply or kill himself. This pattern of activity – of harassing Mr. Periera at home, at places of employment and in public – has been exhibited not only during Mr. Periera's time at the World Bank but also in subsequent employment at smaller firms in New York, namely as temporary staff for Temporary Alternatives and Metropolitan Staffing. The goal in each activity is to not only force Mr. Periera from gainful employment through harassment and defamation in front of his colleagues – claiming Mr. Periera to be a child molestor, terrorist,

murderer and so on, all untrue – but also then to force Mr. Periera to accept that because he will not be a sex slave, as per the Church of Scientology, he has no need of an income and thus should turn over his estate to CAA 'so [they] can initiate a corporate cover-up' and end his life. According to the Defendants, 'Those are the only options' and, further, the Defendants make claims that they are in contact and association with known and FBI-listed terrorist groups like the Jewish Defense League as a way of trying to intimidate the Plaintiff and extort from him things of value, including his life.

52.    The Defendants' daily harassment of the Plaintiff knows no bounds, is a direct violation of his rights as a United States citizen, and enables the racketeering conspiracy created and executed by the Defendants to defraud him of his personal property and career by causing problems in his life – stunted employment, attacks on his person, robbery, a disreputable public profile, stunted educational advancement – the solution for which is to acquiesce entirely to the will of the Defendants who then also intend to profit from the Plaintiff's intentional and untimely demise, which remains an organizing principle in the corrupt enterprise, managed through CAA, engaged in by all Defendants.

### FIRST CAUSE OF ACTION
### RACKETEERING IN VIOLATION OF PUBLIC POLICY
### (Against All Defendants)

53.    Plaintiff realleges and incorporates herein paragraphs 1 through 52 of this complaint as though fully set forth.

54.    At all times mentioned, the public policy of the United States, as codified, expressed and mandated in 18 USC Chapter 96 § 1961-68 ("the RICO Act"): "(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in

12

acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. …(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

55.     In violation of public policy, the Defendants have conspired to profit from the collection of unlawful debts, namely through the extorted acquisition of the Plaintiff's estate and income; his murder by the Defendants; the illegal use of electronic communications technology in furtherance of their conspiracy to harass, annoy, upset the law abiding affairs of, and cause the untimely death of the Plaintiff; and the illegal use of the United States Postal Service to advance an intentional scheme to defraud the Plaintiff and cause him intentional financial harm.

56.     Accordingly, the actions of Defendant, as described herein were wrongful and in contravention of the express public policy of the United States, to wit, the policy set forth in the RICO Act and the laws and regulations promulgated thereunder.

57.     As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to the RICO Act and New York Human Rights Law § 296.3(c) (codified as N.Y. Executive Law, Article 15) and/or any other provision of law providing for prejudgment interest.

58.     As a proximate result of the wrongful acts of Defendant, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

59.     The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, wanton, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each Defendant.

## SECOND CAUSE OF ACTION
## CONSPIRACY TO COMMIT MURDER IN THE FIRST DEGREE
### (Against All Defendants)

60.     Plaintiff realleges and incorporates herein paragraphs 1 through 59 of this complaint as though fully set forth.

61.     At all times, it is the public policy in the State of New York and the United States, as per 18 USC § 372 and 18 USC § 373 and New York Penal Code § 105.15, to prohibit the use of conspiracies to intentionally defraud or cause bodily harm to a law-abiding individual or class of persons, including a United States officer, or to solicit the services of another individual or firm to commit a crime of violence.

62.     Defendants' conduct as alleged above constitutes a solicitation to commit murder, to induce the Plaintiff's suicide through harassment and a conspiracy to destroy the Plaintiff's career, and to cause circumstances that would knowingly result in the Plaintiff's untimely and premature death. As someone employed in a place of confidence of the United States, the World Bank, Defendants actions also constitute an offense against a United States officer.

63.     As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

64.     The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, under the RICO Act, Plaintiff is entitled to an award of treble punitive damages against each of said Defendants.

**CAUSES OF ACTION THREE THROUGH EIGHT**
**FRAUD**
**(Against All Defendants)**

65.     Plaintiff realleges and incorporates herein paragraphs 1 through 64 of this complaint as though fully set forth.

66.     At all times, it is the public policy of the United States, as per 18 USC 63 § 1341, 18 USC 63 §1342, 18 USC 63 § 1343, 18 USC 63 §1344, and 18 USC 63 § 1346, to prohibit fraud, including illegal activities that require or make use of the postal services, electronic communications, bank fraud, or result in honest services fraud.

67.     Defendants knowingly used the electronic communications and the United States Postal Service to propagate fraud against the Plaintiff through the creation of Hermoso Artistry and the creation and sending of a fictitious check by Express Mail. The result was to defraud the Plaintiff of approximately $3150, monies for which he would otherwise be held liable for as a debt to Bank-Fund Staff Federal Credit Union.

68.     Further, the Plaintiff was defrauded of honest services by the Defendants who purported to represent his interests and advance his career, all while working knowingly to undermine not only his professional standing but also, ultimately, to kill the Plaintiff and profit from the illegal acquisition of his assets and estate.

69.     Defendant's conduct as alleged above constituted unlawful actions on account of Plaintiff's protected activity in violation of public policy.

70.     As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to United States Code and/or any other provision of law providing for prejudgment interest.

71.     As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

72.     The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

73.     Plaintiff seeks trebled civil penalties against each Defendant, pursuant to 18 USC 63, in addition to any fines levied by the Court for the conduct described herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### NINTH CAUSE OF ACTION
### HARASSMENT
### (Against All Defendants)

74.    Plaintiff realleges and incorporates herein paragraphs 1 through 73 of this complaint as though fully set forth.

75.    At all times it is the public policy of the United States to prohibit the unlawful harassment, by any means, of a private citizen, as per 18 USC § 2261A, such that "whoever travels in interstate or foreign commerce or is present within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that— (A) places that person in reasonable fear of the death of, or serious bodily injury to— (i) that person; (ii) an immediate family member (as defined in section 115) of that person; or (iii) a spouse or intimate partner of that person; or (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that— (A) places that person in reasonable fear of the death of or serious bodily injury to a person described in clause (i), (ii), or (iii) of paragraph (1)(A); or (B) causes, attempts to cause, or would be reasonably expected to cause substantial

emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A), shall be punished as provided in section 2261(b) of this title."

76.     Defendants knowingly and illegally placed the Plaintiff under illegal surveillance with the intention of not only making him afraid for his life but also to induce him to commit suicide.

77.     Defendant's conduct as alleged above constituted unlawful actions on account of Plaintiff's protected activity in violation of public policy.

78.     As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to United States code and/or any other provision of law providing for prejudgment interest.

79.     As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

80.     The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

81.     Plaintiff seeks trebled civil penalties against each Defendant as set by United

States Code.

## TENTH CAUSE OF ACTION
## COUNTERFEITING
### (Against All Defendants)

82.     Plaintiff realleges and incorporates herein paragraphs 1 through 81 of this complaint as though fully set forth.

83.     Defendants are not only guilty of false personal representations of fact to parties with a material interest in the Plaintiff's success, but also guilty specifically of falsifying financial instruments used to defraud the Plaintiff and put him in legal and fiduciary jeopardy with his credit union, Bank-Fund Staff Federal Credit Union.

84.     At all times mentioned, the public policy of the United States is to prohibit counterfeiting, as per 18 USC § 472 and 475, and punish those guilty by fine or imprisonment or both.

85.     Defendants knowingly passed and published a check in the approximate amount of $3150 with the intent to defraud the Plaintiff 'as punishment.' Plaintiff alleges that the Defendant deliberately and maliciously acted to deceive the Plaintiff as to the nature and extent of the aforementioned business opportunity (Hermoso Artistry) in a manner intended to cause financial and professional reputational harm to the Plaintiff.

86.     As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.

87.     As a proximate result of the wrongful acts of Defendant, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional

suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

88.     The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of trebled punitive damages against each of said Defendants.

## ELEVENTH CAUSE OF ACTION
## ILLEGAL COMPUTER ACCESS
### (Against All Defendants)

89.     Plaintiff realleges and incorporates herein paragraphs 1 through 88 of this complaint as though fully set forth.

90.     At all times, it is the public policy of the United States, as per 18 USC § 1030, to prohibit the use of electronic communications equipment in the furtherance of any criminal scheme, including but not limited to the unauthorized access of data stored on a personal computer by a private citizen and/or the unauthorized access of computers used to transact the business of immune international organizations, such that: "(a) Whoever— (1) having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y. of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the

same and fails to deliver it to the officer or employee of the United States entitled to receive it;
(2) intentionally accesses a computer without authorization or exceeds authorized access, and
thereby obtains— (A) information contained in a financial record of a financial institution, or of
a card issuer as defined in section 1602(n) [1] of title 15, or contained in a file of a consumer
reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15
U.S.C. 1681 et seq.); (B) information from any department or agency of the United States; or (C)
information from any protected computer; (4) knowingly and with intent to defraud, accesses a
protected computer without authorization, or exceeds authorized access, and by means of such
conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud
and the thing obtained consists only of the use of the computer and the value of such use is not
more than $5,000 in any 1-year period; (5) (A) knowingly causes the transmission of a program,
information, code, or command, and as a result of such conduct, intentionally causes damage
without authorization, to a protected computer; (B) intentionally accesses a protected computer
without authorization, and as a result of such conduct, recklessly causes damage; or (C)
intentionally accesses a protected computer without authorization, and as a result of such conduct,
causes damage and loss.  (6) knowingly and with intent to defraud traffics (as defined in section
1029) in any password or similar information through which a computer may be accessed
without authorization, if— (A) such trafficking affects interstate or foreign commerce; or (B)
such computer is used by or for the Government of the United States; (7) with intent to extort
from any person any money or other thing of value, transmits in interstate or foreign commerce
any communication containing any— (A) threat to cause damage to a protected computer; (B)
threat to obtain information from a protected computer without authorization or in excess of
authorization or to impair the confidentiality of information obtained from a protected computer
without authorization or by exceeding authorized access; or (C) demand or request for money or
other thing of value in relation to damage to a protected computer, where such damage was
caused to facilitate the extortion; shall be punished as provided in subsection (c) of this section.

91.     During the course of the Plaintiff's business as a consultant to the World Bank, the Defendants regularly and knowingly illegally accessed the business and personal computers of the Plaintiff, with the intent to cause harm not only to the Plaintiff's property and reputation, but also to the affairs, relating to the national security of the United States, the Plaintiff conducted as part of his employment.

92.     Outside of the Plaintiff's lawful conduct on behalf of the World Bank, the Defendants have also consistently and knowingly used illegal computer access, by way of remote neural monitoring as well as illegally tampering with the Plaintiff's cellular phone, to harass, annoy and cause bodily harm to the Plaintiff such that it would result in his death.

93.     Defendant's conduct as alleged above constituted unlawful actions on account of Plaintiff's protected activity in violation of public policy.

94.     As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to United States Code and/or any other provision of law providing for prejudgment interest.

95.     As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

96.     The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of

Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

97.     Plaintiff seeks trebled civil penalties against each Defendant, pursuant to 18 USC 63, in addition to any fines levied by the Court for the conduct described herein.

## TWELFTH CAUSE OF ACTION
## MEDICAL EXPERIMENTATION WITHOUT INORMED CONSENT
### (Against All Defendants)

98.     Plaintiff realleges and incorporates herein paragraphs 1 through 97 of this complaint as though fully set forth.

99.     At all times, it is the public policy of the United States that any activities by an entity, public or private, conducted on human subjects, that in any way, shape or form resemble a medical experiment, must only transpire after informed consent has voluntarily been given –in writing only – as per 45 CFR 50.204-205.

100.     Defendants have knowingly and recklessly made use of novel technologies like remote neural monitoring, with the express purpose of not only illegally influencing the Plaintiff's behavior – by, for example, making him a 'sexual slave' to the Defendants' executives, by their own admission – with not only the intention to study the effectiveness of their torture on the Plaintiff but also the intention of causing bodily harm and death for non-compliance with the Defendants wishes, however legal or illegal.

101.     Defendants, on January 4, 2018, have admitted that in the course of causing the Plaintiff's untimely death, they also were keenly interested in and studying the effects of their torture on the Plaintiff with the 'sole purpose of making it more effective.'

102.    The unrestricted use of these new communications technologies not only violates the sanctity of individual privacy at its most basic level, but without informed consent constitutes an unauthorized and continuous medical experiment subject to, but not in compliance with, standards established by the Code of Federal Regulations for informed consent—which was never given or obtained by Defendants, as their primary purpose in initiating this experiment was to knowingly and recklessly cause the Plaintiff's death.

103.    As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to United States Code and/or any other provision of law providing for prejudgment interest.

104.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

105.    The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF THE FOURTH AMENDMENT
### (Against All Defendants)

106.    Plaintiff realleges and incorporates herein paragraphs 1 through 105 of this complaint as though fully set forth.

107.    At all times, it is the policy of the United States to ensure that, as per the Fourth Amendment 'the people are secure in their persons…,' a legal maxim that is underscored by not only the Government's interest in preserving the life of its citizens but also forms the basis for what constitutes a reasonable expectation of privacy and, indeed, the very concept of individual liberty itself. While it is true that Courts usually look to the private sector to determine whether a Government action violates a reasonable standard of privacy, the technology at issue in this case, remote neural monitoring, allows whomever has the money to invest in such a system – approximately $20,000 – unwarranted and unlimited access to the most private thoughts of any targeted individual, as well as to the capacity to manipulate that knowledge, unaccountably, for private interests that may be neither benign nor legal. Further, it is important to note that Government action, in this case and so far as exists in the public record, upholds the Fourth Amendment's expectation of the objective privacy of one's thoughts, with reasonable exceptions for national security (for example, an imminent threat to the public).

108.    Defendants have knowingly and recklessly violated a kind of privacy so basic to the concept of an individual citizen's basic security with the intention of causing bodily harm and death to the Plaintiff.

## FOURTEENTH CAUSE OF ACTION
## VIOLATION OF THE THIRTEENTH AMENDMENT
### (Against All Defendants)

25

109.   Plaintiff realleges and incorporates herein paragraphs 1 through 108 of this complaint as though fully set forth.

110.   At all times, it is the public policy of the United States to prohibit slavery and indentured servitude, as enumerated in the Thirteenth Amendment to the Constitution of the United States of America, which states "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

111.   Defendants knowingly and recklessly acted in a manner that would stymie the legitimate business opportunities of the Plaintiff and force him to produce works that, due to honest services fraud, he would never receive due remuneration for. The stated goal of the Defendants, thus, was to place the Plaintiff into a kind of slavery, enforced by the illegal application of information and communications technology and the expressed proviso that the Plaintiff would die, the fruits of his labors given up as slavery profits to the Defendants.

112.   As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to United States Code and/or any other provision of law providing for prejudgment interest.

113.   As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional

suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

114.    The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

**FIFTEENTH CAUSE OF ACTION**
**HUMAN TRAFFICKING**
**(Against All Defendants)**

115.    Plaintiff realleges and incorporates herein paragraphs 1 through 114 of this complaint as though fully set forth.

116.    At all times, it is the public policy of the United States to prohibit human trafficking, especially as it relates to exploitation of human beings for sex and financial gain, as per 18 USC § 1593A.

117.    Defendants knowingly and recklessly acted to force the Plaintiff not only to forfeit his career but also to force him to become a human trafficking victim for the purpose of exploiting him sexually, for financial gain through direct control of his assets and income, and by way of his involuntary relocation from New York to Los Angeles to 'live in the home of Kevin' and be his 'sex slave,' at his own expense.

118.    As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary

and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to 18 USC § 1595 and/or any other provision of law providing for prejudgment interest.

119.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

120.    The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

## FIFTEENTH CAUSE OF ACTION
## DEFAMATION
### (Against All Defendants)

121.    Plaintiff realleges and incorporates herein paragraphs 1 through 120 of this complaint as though fully set forth.

122.    At all times, it is the public policy of the United States to prohibit the slander of any individual such that the speech has 'caused damage to reputation or emotional distress, have

28

presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person,' as per 22 USC § 4101.

123.    Defendants knowingly, recklessly and repeatedly make slanderous statements about the Plaintiff by way of illegal access of public address systems, and illegal wire and computer access, such that the Plaintiff would be rendered unemployable for the sole purpose of furthering their conspiracy to murder the Plaintiff.

124.    As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to 18 USC § 1595 and/or any other provision of law providing for prejudgment interest.

125.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

126.    The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

## SIXTEENTH THROUGH EIGHTEENTH CAUSES OF ACTION
## CIVIL RIGHTS VIOLATIONS
### (Against All Defendants)

127.    Plaintiff realleges and incorporates herein paragraphs 1 through 126 of this complaint as though fully set forth.

128.    At all times, it is the public policy of the United States, 42 USC § 1982, that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

129.    Further, at all times, it is the public policy of the United States, as per 42 USC § 1983 to prohibit "every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or person in the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws" by providing for "an action at law, suit in equity or other proper redress."

130.    Further, at all times, it is the public policy of the United States, as per 42 USC § 1985, that 1) "if two or more persons conspire to prevent, by force, intimidation or threat, any person from accepting or holding any office, or place of confidence under the United States, or from discharging the duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties; 2) …if two or more persons in any State or Territory conspire for the purpose of impeding, hindering,

obstructing, or defeating, in any manner, the due course of justice with the intent to deny any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of any laws; 3) if two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or territory the equal protection of the laws; …the party so injured or deprived may have an action for the recovery of such damages occasioned by such injury or deprivation, against any one or more of the conspirators."

131.    Further, at all times, it is the public policy of the United States, as per 18 USC § 1986 that "every person who, having knowledge that any of the wrongs conspired to be don, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action."

132.    As to 42 USC § 1982, Defendants have knowingly and recklessly acted to prohibit the Plaintiff from owning or leasing personal property, including the bribing of residents and the stoking of discontent within the property currently under lease by the Plaintiff, and have repeatedly and without regard for the Plaintiff's safety made false claims in public that the Plaintiff is, for reasons of racial animus, 'public property' to which any other person is entitled to treat or remove from him those things that he has secured by his own work.

31

133.    As to 42 USC § 1983, Defendants have knowingly and recklessly acted to prohibit the work of the Plaintiff on behalf of the World Bank, a place of confidence of the United States, and have consistently infringed on the immunities thereby granted. Indeed, the Defendants have knowingly and recklessly tried to hold hostage the Plaintiff's work so as to force him to advocate for policies and positions inconsistent with the World Bank and the Plaintiff's own free speech, free movement, free association, and right to employment.

134.    As a proximate result of the aforesaid acts of Defendant, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.  Plaintiff claims such amounts as damages pursuant to 42 USC § 1982-1983 and/or any other provision of law providing for prejudgment interest.

135.    As to 42 USC § 1985, the Defendants have knowingly, recklessly, conspiratorially and consistently acted to intimidate the Plaintiff undermine and stop the Plaintiff from pursuing civil remedies that would inhibit their behavior and the furtherance of their conspiracy. This has included death threats, the stoking of anger and violence toward the Plaintiff in his neighborhood and home, and consistent electronic and verbal harassment regarding the Plaintiff's status as a member of two suspect classes, as a mixed race gay man.

136.    As to USC § 1986, officers and directors of the companies comprising the Defendants, have knowingly and recklessly neglected to prevent the responsible parties and named Defendants in this civil action from continuing their behavior to render the Plaintiff dead, such that their neglect very nearly represents a corporate policy. Indeed, Defendants at CAA were even told that the result of causing the untimely death of the Plaintiff would be a "promotion," a fact admitted by said Defendants.

137.    As a proximate result of the wrongful acts of Defendants, and each of them,

Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

138.    The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

**NINETEENTH CAUSES OF ACTION**
**TORTURE**
**(Against All Defendants)**

139.    Plaintiff realleges and incorporates herein paragraphs 1 through 138 of this complaint as though fully set forth.

140.    At all times, it is the public policy of the United States, as per the Torture Victims Protection Act, "that an individual who, under actual or apparent authority, or color of law, of any foreign nation…subjects an individual to torture shall, in a civil action, be liable for damages to that individual," where "torture" is defined by 18 USC 2340, as "severe mental pain or suffering" or "the intentional infliction or threatened infliction of severe physical pain or suffering

33

141.    Defendants have knowingly and recklessly engaged in a pattern of torture, as defined by statute, threatening the Plaintiff with bodily harm and imminent death, threatening to "eliminate [the Plaintiff's] entire family," and through the use of remote neural monitoring, defined by statute, made use of "procedures calculated to disrupt profoundly the senses or the personality" of the Plaintiff.

142.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms.  Plaintiff is informed and believes and thereupon alleges that he will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

143.    The acts taken toward Plaintiff were carried out by Defendant's officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff.  Defendants and each of them, and their agents/employees or supervisors, authorized, condoned and ratified the unlawful conduct of each other.  Consequently, Plaintiff is entitled to an award of punitive damages against each of said Defendants.

## DEMAND FOR JURY TRIAL

## PRAYER

WHEREFORE, Plaintiff prays for judgment as follows against all Defendants, and each of them:

34

1.     For lost income and other economic damages on all causes of action in an amount according to proof at the time of trial;

2.     For emotional distress damages on all causes of action that allow for such a recovery;

3.     For compensatory, general, economic, and non-economic damages;

4.     For punitive damages in an amount according to proof at the time of trial on all causes of action that allow for such a recovery;

5.     For attorneys' fees on all causes of action that allow for such a recovery;

6.     For prejudgment interest on all causes of action that allow for such a recovery;

7.     For costs of suit incurred herein;

8.     For penalties pursuant to each violation of the codes and laws enumerated herein;

9.     For attorneys' fees, costs, and interest pursuant to New York Human Rights and Labor Law and any other applicable statute; and

10.    For a disgorgement of any ill-gotten profits from the Plaintiff's labor and any records or data or intellectual property originating or about the from the Plaintiff.

11.    For such other relief as may be just and proper.

Dated this 18TH day of JANUARY, 2018

_____

FABIO KRISHNA PERIERA , Pro Se

35

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
### (Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

*January 3, 2017*

11:19 am
JOHN DOE 1: This is how you get rid of a client you don't like [by getting them to commit suicide].

11:23
JOHN DOE 1: Alright kid, I'm willing to settle this case right here, right now. But in order for me to settle, you have to commit suicide. No, don't write that.
JANE DOE 1: Well what do we do now?
JOHN DOE 1: This is when we begin to back away. But let me try one more time. Fabio, I need you to commit suicide.'

11:30
JOHN DOE 1: May I draw your attention to what you said about being successful. You said you'd buy an American car. But no, you didn't. And you wanna know why? Because you're an anti-semite.

11:31
JOHN DOE 2: Jesus God!
JANE DOE 1: 'You wanna know the lesson we're learning? Don't fuck with the CIA. The real one.
JOHN DOE 1: This isn't funny Fabio. Real people will get hurt.
JOHN DOE 2: Why don't you just say it—real white people!
JOHN DOE 1: We need you to commit suicide, Fabio. That's the only way the entertainment industry can move on, the only way we get away with it. Kid, you don't understand...Listen to me, Fabio. I need you to take our side. As I said, that's the only way we get away with it.
JANE DOE 1: Which means they need you to commit suicide. Go ahead, Fabio. Let them know they're under surveillance by the FBI.
FABIO PERIERA: I am demanding that you stop talking while I work. This is harassment in my own home and it is illegal. You will be prosecuted. You have been warned. You have no legal authority for your actions and I do not want you in my life. This surveillance is illegal and will be prosecuted to the fullest extent of the law.
JOHN DOE 1: 'Replace prosecuted with punished.'

11:49
JOHN DOE 1: You were about to ask if I enjoyed scamming your bank account. And yeah, I did.
JANE DOE 2: This is all your fault, Fabio! Thanks to you, we're not going to get away with any of it!


*July 6, 2017*


16:21

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

JANE DOE 1: Fabio, we know you're going to commit suicide, so hey, how about committing suicide for UTA?

Fabio, how about making out your life insurance to UTA?

19:11
JANE DOE 1: See, Fabio, you're not gay. If you were gay, you'd be able to afford it.

19:15
JOHN DOE 1: Why don't we deserve a Tom [Cruise]?

19:17
JOHN DOE 1: You don't want to be our Tom? Alright, then commit suicide. That's the only other option.

19:55
JANE DOE 1: Don't worry, Fabio, soon you'll be straight.

21:39
JANE DOE 1: Hey, you know what this is? This is payback! For never getting it up when you have se with our executives.

22:23
JOHN DOE 1: Fabio, you're right, life isn't fair. So then, take your own life. Then we can say the intelligence [for the Iran Deal] is bad.

*7 July 2017*

12:00
JOHN DOE 1: It's better to be our client that a murder victim. We're killing you with rhetoric. So kill yourself.

12:05
JOHN DOE 1: I get to abuse you. We all know you want me to win. Commit suicide or sign with UTA: give me your will.

*July 8, 2017*

12:55
JOHN DOE 1: Now remember, Fabio, today we're going to practice the new way of boarding the train [by jumping in front of an oncoming train].

13:22
JOHN DOE 1: You don't want to work with UTA? Fine, then commit suicide.

13:24

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

JOHN DOE 1: If you don't [unintelligible] work with UTA then commit suicide. There's a lot of money.

JANE DOE 1: That's the whole reason we're doing this. [Trying to get you to commit suicide.]

15:02
You're only allowed to have sex with our executives—with me.

15:24
JOHN DOE 1: If you didn't have a notebook, they would be the personal I harass.
FABIO PERIERA: Are you a stalker?
JOHN DOE 1: Yes, I am.

15:20
JANE DOE 1: What's the wait, Fabio? Studying how to document our harassment?

15:54
JANE DOE 1: You're so annoying, come on, just kill yourself!

16:05
JANE DOE 1: Fabio, you continue this harassment because you're walking.

16:22
JANE DOE 1: I don't like this, and of not interrupting you for a whole hour.

16:42
JANE DOE 1: You're at yoga and I just told you to kill yourself. What are you going to do about it?

16:47
JOHN DOE 1: Now Fabio, you're [unintelligible] and you're going to go home and you're going to kill yourself.

19:58
JANE DOE 1: UTA wants to watch you die. For real this time.

22:47
JANE DOE 1: Anything we can do to put a black man in prison—a black man who's innocent.

*July 9, 2017*

10:06
JOHN DOE 1: This is connected to JDL. Meir Kahane is my friend.

EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

10:31
JANE DOE 1: The reason of this treatment is to erode your confidence, so you commit suicide.

11:54
JANE DOE 1: See, how'd you like to be like him? Only we get to harass you and you can only sleep with our executives.

12:35
JOHN DOE 1: That's the way we want it!
[This was a reference to another statement about wanting a world where black people are only entertainers and denied their rights.]

12:43
JANE DOE 1: Look at the little girl. Now, don't you want to molest her?

16:17
JANE DOE 1: Come on, Fabio, it's either you kill yourself or UTA. To the victor goes the spoils and the victor is UTA.

16:24
JANE DOE 1: We've made him as paranoid as we can and still it isn't good enough.

22:41
JANE DOE 1: We're so fucked. We would end up going to prison.
JOHN DOE 1: Put a bullet in his head. You signed a lifetime contract.

*July 10, 2017*

00:07
JANE DOE 1: More harassment, wake him up.

July 12, 2017

20:15
JANE DOE 1: Fabio, we both know you want to commit suicide [because you're not an actor].

July 13, 2017

19:50
JOHN DOE 1: You can't be successful unless you convert [to Judaism].

July 14, 2017

EXHIBIT A: Transcript of Daily Harassment by CAA et al.

(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

9:23
JANE DOE 1: Fabio, this suicide has been coming a long time. Ready?

11:20
JANE DOE 1: Fine, you don't want to go back into acting. Commit suicide then.

*July 18, 2017*

7:39
JANE DOE 1: Fabio, you need to sleep forever.

*July 20, 2017*

JANE DOE 1: I get why stalking victims feel as they do.

*August 21, 2017*

01:00
JANE DOE 1: When UTA decides to kill someone, we have all bases covered.

*September 1, 2017*

11:10
JANE DOE 1: We need a full team effort to kill the nigger and let's make sure he's dead!

*September 30, 2017*

19:15
JOHN DOE 1: 'If you weren't gay, your life wouldn't be so fuckin' tragic.
JANE DOE 1: Are you bigoted against gay men?
JOHN DOE 1: Yes, I am.

*November 5, 2017*

19:23
JANE DOE 1: From now on, you're only allowed to jack off thinking about Kevin Huvane.

19:25
JANE DOE 1: Writing it down makes you look unattractive.

*November 6, 2017*

12:22
JOHN DOE 1: I'm coming in [to your shower].

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

*November 7, 2017*

7:34
JOHN DOE 1: We're letting you live. Because I work for the Mossad.

*November 8, 2017*

15:33
JOHN DOE 1: I'd rather pay you [for sex], big man.

15:45
JOHN DOE 1: I'm stealing [your intellectual property] right now. All I need is for you to die [and your will] so that we can have a claim. Fabio, no. [Presumably a reference to these statements being documented.]

*November 12, 2017*

9:04
JOHN DOE 1: I want you to develop full blown AIDS, Fabi. For all of the pozzing, even though I know it was just a story and you never did it.

9:10
JOHN DOE 1: I want you to know, Fabi, at this point all we're interested in is murder. Cuz Michael Jackson.

9:33
JOHN DOE 1: The CIA and the FBI have been letting us get away with this [murder] for a long time. We're gonna win.
FABIO PERIERA: Really, well I should probably pull CAA's FBI file. FOIA. And that Argentinian guy, are you paying for his flights
JOHN DOE 1: Can you pay—
FABIO PERIERA: Well, then I guess the prosecutors who could do that too and there's other ways to get at that information at trial

9:35
FABIO PERIERA: We've reached that point, Fabio. Why don't you kill yourself and let white people develop this technology.

*November 16, 2017*

11:49
FABIO PERIERA: 'You torture people and expect them to give you money.'
JOHN DOE 1: I do.

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
### (Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

11:51
JOHN DOE 1: CAA enforces a strict racial hierarchy.

*November 17, 2017*

10:51
JOHN DOE 1: If you don't come back to entertainment, I'll break everything. Don't be surprised if you come home and everything in your apartment is broken.

15:11
JANE & JOHN DOE 1: You can't fire us because you're black.

15:25
JOHN DOE 1: This is how it is, kid. We rarely do [use the telephone] when we are trying to kill somebody. Yeah, that's it.

15:50
JOHN DOE 2: Hey Fabio, I'm gettin'a boner. You know why? Because I'm killing you.

15:51
JOHN DOE 1: We're killing you slowly, kid. I want you to die of full blown AIDS.


*November 20, 2017*

15:18
JOHN DOE 1: Come on, Fabio, I got you a job committing suicide! That's what we want, Fabio. CAA is that powerful.


*December 4, 2017*

9:10
JANE DOE 1: Hey Fabio, when you jack off think of a woman this time.
JOHN DOE 1: Give us 10% of your income.
FABIO PERIERA: Welcome to the age you live in, you have the skills you've got.

9:23

JANE DOE 1: Fabio, no, after what you just said you can't have clean underwear.
FABIO PERIERA: You harass me everytime I do something you don't like. Like knowing executives.
JOHN DOE 1: That's right,big man.
FABIO PERIERA: Because if I don't know any, you can deny everything [and every job opportunity] until I commit suicide.
JOHN DOE 1: I'm gonna plead the Fifth on that one.

9:56

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
### (Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

Fabio, I need you to delete that email. You're coming back to entertainment.
FABIO PERIERA: So you can control everything and kill me off. And I don't want to die.
JANE DOE 1: Yes, you do Fabio because you won't come back to entertainment.
FABIO PERIERA: By the way, who authorized you to read my email?
JANE DOE 1: I plead the fifth on that one.'

9:57
JANE DOE 1: Fabio, you have sex with an organ that has poo in it.
JOHN DOE 1: Fabio, no, you're not allowed to get off [the train] here. This is what it's like managing your schedule.
FABIO PERIERA: There you go, claiming a job you don't have.
JOHN DOE 1: Kind of like you, big man.
FABIO PERIERA: Yeah, except I think I'm allowed to be my own intelligence agent in my life. Kind of like you always being your own best talent agent.
JOHN DOE 1: Except when CAA comes along--
FABIO PERIERA: And I have to kill myself and give CAA everything.
JOHN DOE 1: Exactly.

10:05
JANE DOE 1: Fabio, didn't [sic] you forget, you have to leave something behind?
JOHN DOE 1: For taking the train, Fabio, you have to.
JANE DOE 1: Fabio, no. You can only buy one. Eliminate the Black one.
JOHN DOE 1: Cuz, you know!

10:15
FABIO PERIERA:You don't get to abuse someone or make them a sex slave.
JOHN DOE 1: Yes we do, big man.
JANE DOE 1: You know why?
JOHN DOE 1: Because we control everything thing.
FABIO PERIERA: Do you mean CAA or Jews.
JANE DOE 1: We mean the Jews as well. so you'd better give up.
JOHN DOE 1: And kill yourself.
JANE DOE 1: Or come back to entertainment, where you'll end up killing yourself anyway.
FABIO PERIERA: I've moved on with my career.
JOHN DOE 1: Then give me 10% of your income.
FABIO PERIERA: That's extortion.
JOHN DOE 1: I'm letting you live, big man.
FABIO PERIERA: My kids are not going to be shot by cops. But you have a problem with that because a good child is molested.
JOHN DOE 1: I plead the Fifth on that one.

10:33
JANE DOE 1: Fabio, wanna make the next statement conditional on hurting [former Director of Central Intelligence] John Brennan?

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.

### (Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

12:00
JOHN DOE 1: Give us <u>10%</u>. We need to prove you were part of the Enterprise.

*December 5, 2017*

9:22
JOHN DOE 1: 'Why won't you let us destroy your life?
JANE DOE 1: 'Are you prepared to make the ultimate sacrifice and kill the president?
JANE DOE 2: You're gonna kill yourself and we're gonna make money on it.

<u>19:28</u>
JOHN DOE 1: No Fabio, you can't. You're not allowed to be successful. You have to kill yourself.

*December 6, 2017*

7:32
JANE DOE 1: Fabio, if you keep this up, we will kill you.

JANE DOE 2: Hey Fabio, if you don't murder people the alien will come.

8:25
JANE DOE 1: You're only allowed to think of people you want to kill! Either that, or you could audition.
FABIO PERIERA: You don't get to lynch me.
JOHN DOE 1: Yeah I do, and you know why? Cuz I'm white.

10:46
JOHN DOE 1: Cut us in on it or we're gonna lynch you.
FABIO PERIERA: No.
JOHN DOE 1: Alright, it looks like we're lynching the nigger.
JANE DOE 1: We're gonna lynch you. Let's just start calling him nigger.
JOHN DOE 2: Say 'nig.'

10:55
JANE DOE 1: Hey, guess who it is? It's CAA. We're lynching the nig.
JOHN DOE 1: Yes, I'm lynching your whole family.

10:56
JOHN DOE 1: Fabio, RICO is only for white people.
JANE DOE 1: I'll pay you $600,000 if you kill yourself.

*December 8, 2017*

11:55
JANE DOE 1: Fabio, this isn't going so well. I need your help.

EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

FABIO PERIERA: What like going on a stabbing attack?
JOHN DOE 1: Exactly.

11:25
JOHN DOE 1: Can you see why we want to get you high? That's why we decided to get you off your medication.

13:05
FABIO PERIERA: But you racketeered me out of the World Bank, didn't you?
JOHN DOE 1: We did. Because the World Bank wasn't right for you.

15:56
FABIO PERIERA: But with Black Cube, CAA can be in control of my career.
JOHN DOE 1: Exactly.
FABIO PERIERA: And pervert United States policy?
JOHN DOE 1: I plead the Fifth on that one.

17:29
JANE DOE 1: Fabio, when are you going to go back to being a sex slave?
JOHN DOE 1: You should have sex with Angelica.

*December 9, 2017*

7:25
JANE DOE 1: We all are, we're doing this as a matter of white supremacy.

8:30
JOHN DOE 1: The only time it'll be quiet is when you're havin' sex with me.
JANE DOE 1: Fabio, we set all this up so you'd kill yourself, including porn, and you wanna go and be successful at it?

*December 9, 2017*

JANE DOE 1: You have to understand [unintelligible]. The State of Israel.

20:43
JOHN DOE 1: What gives you the right for this to come to an end?
FABIO PERIERA: Being a citizen of the United States of America.
JOHN DOE 1: But what if you're not?
JANE DOE 1: Fabio, lets play this game one more time. I want you to kill the—
FABIO PERIERA: Director [of Central Intelligence]. So are you admitting CAA is putting me up to it?
JOHN DOE 1: I plead the Fifth Amendment.
JOHN DOE 3: Do not be surprised if you find FBI agents around your building.
JANE DOE 1: The best part about it is he thinks it's the CIA.

EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

JOHN DOE 1: Little did he know it was the CIA of Hollywood [a nickname internal to and about CAA].
JANE DOE 1: Maybe we should give up.
JOHN DOE 1: No, no. If I'm going down, I'm taking you down with me.
JANE DOE 1: Fabio, you've got to put the notebook away.
JANE DOE 2: Fabio, did you [unintelligible] FBI agents are [unintelligible].
JANE DOE 1: Fabio, give us your stuff!
FABIO PERIERA: Are you aware that you're telling a public official that you'd like to put him up to kill other public officials?

21:12
JOHN DOE 1: This is how you kill someone. [Unintelligible].
JANE DOE 1: At this point, it doesn't matter what we do as the FBI's gonna put us in prison!

*December 10, 2017*

8:18
JANE DOE 1: We had to step it up when you didn't fall for the Tomer thing.
JOHN DOE 1: And you wouldn't kill Christopher [Wray].

8:34
JANE DOE 1: Fabio, you should [rape your sister]. Your sister isn't going to want to sit next to you.
JOHN DOE 1: Fabio, you went away for the weekend and you didn't even get—Oh, never mind.

8:40
JOHN DOE 1: Fabio, you went into intelligence and they wouldn't let you kill people. How do you feel about that?
FABIO PERIERA: That wasn't the reason I went into intelligence. I went into intelligence to work on counterproliferation. What's the matter? You think you go into into intelligence and they don't let you kill people until CAA said eliminate an entire family?
JANE DOE 1: I will plead the Fifth on that.
JOHN DOE 1: So will I. You are only allowed to be a sex slave. That's the only thing you're allowed to be.
JANE DOE 1: For Jews only. May as well get some anti-Semitism in there. Well Fabio, it looks like we lost this one. It looks like we need your help.
FBI AGENT: Fabio, shut 'em down.
FABIO PERIERA: Well, there was that time the government sent FBI Agents into the World Bank. And they must've said, 'This is RNM (remote neural monitoring). And that explains the actions of law enforcement thereafter, from ATF to NYPD. That's what this is: the end of an Israeli operation to dent the Iran Deal.
JOHN DOE 1: I plead the Fifth on that one.

### EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

JANE DOE 1: I plead the Fifth too.
JOHN DOE 1: First you, though. We've already started on Angelica. To kill.


16:59
JOHN DOE 1: Now Fabio, I'm your master.
FABIO PERIERA: Why are you doing this to me?
JOHN DOE 2: Because it's fun and [sarcastically] NYPD thought they'd make money on it too.
JOHN DOE 1: Fabio, no!


*December 11, 2017*

9:03
FABIO PERIERA: So CAA engaged in a conspiracy to profit off of someone's death?
JOHN DOE 1: Yes, exactly.
FABIO PERIERA: Is this at all related to the Russian election hacking of 2016?
JOHN DOE 1: I plead the Fifth on that one.


9:48
JOHN DOE 1: Hey Fabio, that's what we would argue!
[This comment was made as I was reaking a CTV article on Twitter, dated December 11, 2017,
9:48: LIVE UPDATES: Garnier's defense lawyer argues Campbell died accidentally during
rough sex.]

9:55
FABIO PERIERA: Did you hack my phone for the purposes of illegal surveillance?
JOHN DOE 1: Yes, we did Fabio. Now, hang up and kill yourself so we can get away with it.


10:02
JOHN DOE 1: Hey Fabio, that'll never be you. We decided we'd kill you and take all of it. We.
CAA. Hey Fabio, we're going to get away with it. You know why? We do this kind of stuff all
the time.
[This comment was made as I looked at an article on Twitter from Out Magazine, December 11,
2017, 9:58, entitled 'Queer songwriter @justinranter and @WillandGrace also nominated'.]


11:55
JOHN DOE 1: Fabio, I've been doin' this for CAA for a long time—killing people.


12:04
FABIO PERIERA: Why did you think [killing people] was a power you had?
JANE DOE 1: Because we're good at getting away with it. We've been doing it a long time.

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

*December 13, 2017*

11:36
JOHN DOE 1: That's it, Fabio, we hacked that computer!

*January 1, 2018*

14:02
If you don't give us 10% I'm going to have to hire a hitman.

14:35
JOHN DOE 1: It's a shame you turned against CAA. With your help we could have defrauded the World Bank of millions.

15:04
JOHN DOE 1: We're trying to cover up what we did to get Donald Trump elected.

15:42
JANE DOE 1: You know what we're going to say about him? We're gonna say he killed himself to get a part in a movie. We conned him.
JOHN DOE 1: Fabio, you're leaving us ith no other opton and unfortunately you're going to have to kill yourself. Now, get a knife—I know it's not going to happen, I just like saying it. Maybe I'll get lucky.

15:48
JANE DOE 1: What wrong with being the fall guy? It's the role you were born to play.

*January 2, 2018*

7:12
JOHN DOE 1: Don't you see, we can actually compete with them [CIA and NSA].

7:54
FABIO PERIERA: How many people were Black Cube contracted to kill?
JOHN DOE 1: You and your whole family.

12:00
JOHN DOE 1: Now remember, Fabio, I'm lettin' you live.

12:51
JOHN DOE 1: You have to die so we can live. Don't you see? We're guilty, Fabio.

20:58
JANE DOE 1: This isn't fair, Fabio, you were supposed to take the fall.

### EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

*January 3, 2018*

7:14
JOHN DOE 1: Illegal is more fun.

7:16
JOHN DOE 1: Only the Jews matter.
JANE DOE 1: Well, well, well. I guess you don't want to live. I'll kill ya.

7:28
JANE DOE 1: Fabio, when you're masturbating, I want you to think of a woman this time.
JOHN DOE 1: See? He still hasn't given up. You'll end up being straight like your father, just how he wants it.

7:33
JANE DOE 2: Fabio, I need you to start thinking of a woman this time.
JOHN DOE 1: That's an order.

7:34
JOHN DOE 1: Fabio, I need you to stop writing everything down.

7:35
JOHN DOE 1: Fabio, I told you to use the police department only.

7:36
JANE DOE 2: Fabio, I need you to stop writing everything down.
RICHARD LOVETT: Well, can we kill this guy?
JANE DOE 2: The FBI is making it extremely hard.

7:38
RICHAR LOVETT: Great… [Pause.] Fabio, this is not Dick Lovett. Dick Lovett does not need to be a named defendant.
FABIO PERIERA: Yeah you are, and yes, you are.
JANE DOE 1: Fabio, I need you to stop writing everything down.

7:46
JOHN DOE 1: Fabio, I offered you a part committing suicide and you didn't want it.
FABIO PERIERA: Are you asking me to commit suicide?
JOHN DOE 1: Yes, I am.

8:19
JANE DOE 1: Fabio, this who prosecution thing needs to stop! Why can't you just be destroyed like a good man?
JOHN DOE 1: Then you'll be dead.

EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

8:33
JANE DOE 2: Fabio, this whole federal prosecutor thing has to stop!
FABIO PERIERA: Why's that?
JANE DOE 2: Because otherwise I'll go to prison.

8:35
JANE DOE 1: Fabio, what if you go to federal prison for me?
JOHN DOE 1: It'll be the role of a lifetime!

8:45
JOHN DOE 1: Now, Fabio, I would kill you but the FBI is making that a little difficult. So I need you to kill yourself.

9:03
JANE DOE 1: Fabio, we've gotten to the point where we start taking things from your apartment.
JOHN DOE 1: You need punishment.

11:45
JOHN DOE 1: We were gonna steal it all from you.

15:30
JANE DOE 1: You bastard!

*January 4, 2017*

13:20
FABIO PERIERA: Did you monitor and track the effects of your remote neural monitoring?
JOHN DOE 1; Yes, we did Fabi, with the sole purpose of making it more effective. [Pause.] Sex slave, Fabi. That's your job.
FABIO PERIERA: And this is for Israel?
JOHN DOE 1: No, this is because I'm American. And by American, I mean… [white].

13:57
FABIO PERIERA: Did you illegally access my computer and remove evidence of fraud?
JOHN DOE 1: Yes, we did.

*January 5, 2018*

11:20
JANE DOE 1: I don't care. You're murdering someone.

13:40
JANE DOE 1: Hey Fabio, this is the thing. If we don't get away with it we could be guilty of treason.

18:17
JANE DOE 1: It's fine Fabio. The CAA directorship told us that if we kill you we get a

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

promotion.

18:28
JOHN DOE 1: Let us take your life, young man.
18:29
JOHN DOE 1: Yeah, that's good. That's how we got Whitney Houston. Think about the afterlife.

19:31
[The sound of a laugh track is added to the background of what both JANE and JOHN DOE are saying and my responses to them.]
JANE AND JOHN DOE 1: Run!
JOHN DOE 1: We're trying to make it like David Lynch so we can, well you know—
JANE DOE: Lynch the nigger.

*January 9, 2018*

12:35
JOHN DOE 1: Then you have to give the Israeli guy money.

13:03
JANE DOE 1: Kill the black man, steal his stuff.

*January 10, 2018*

18:33
JOHN DOE 1: I need you to forgive CAA and kill yourself. That's the only way for CAA to live.
JANE DOE 3: Forgive.
JANE DOE 4: From now on, forgive means to kill yourself.
JANE DOE 1: Forgive.

19:07
JANE DOE 6: We're gonna make it look like you were murdered by accident.

22:18
JOHN DOE 1: We're trying to make it so uncomfortable that you kill yourself.

*January 11, 2018*

9:24
JANE DOE 2: Don't write this down, Fabio, but I think I might plead insanity.

15:03
JOHN DOE 1: Fabio, no, I won't let you file against Black Cube. We use Black Cube all the

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
### (Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

time. They're good.

15:45
JANE DOE 2: Fabio, I need you to eliminate the part about Black Cube, otherwise CAA won't hire us again.

22:07
FABIO PERIERA: Let's go back to the 2016 election. When did you realize you could use me to Donald Trump's advantage? Was it at the beginning?
JOHN DOE 1: At the beginning.
FABIO PERIERA: Was this in any way related to overtures made to Donald Trump['s campaign] by the Kremlin and Russian security services?
JOHN DOE 1: I plead the Fifth on that one.
JANE DOE 1: I can't remember that.
FABIO PERIERA: Thank you for your cooperation. At what point did you realize what you were doing, if successful, amounted to a Russian smear campaign against Hillary Clinton?
JOHN DOE 1: I plead the Fifth on that one.
JANE DOE 1: [Unintelligible.]
FABIO PERIERA: Thank you for your cooperation. We'll continue this later.

22:28
KEVIN HUVANE: Hey Fabio, this is the thing. [Unintelligible.] we landed this whole CAA-CIA thing as a matter of keeping you down—oh my God, you're going to end up taking down all the others.

22:37
JANE DOE 1: This guy's got a full deck. Why are we playing these games with him?
JOHN DOE 1: Because--
FABIO PERIERA: It's about racial superiority.
JOHN DOE 1: Exactly.
JANE DOE 1: No wait, it's because--
JOHN DOE 1: We could go to jail for treason.

22:44
KEVIN HUVANE: Hey Rob, do your alien voice again.

*January 13, 2018*

## EXHIBIT A: Transcript of Daily Harassment by CAA et al.
(Note: All Jane and John Does have self-identified as either CAA or Black Cube executives.)

13:41
JOHN DOE 1: We're in control of everything We're in control of your sex life.


*January 14, 2018*

JANE DOE 1: Is this the game we're playing? Kill the nigger!


JANE DOE 1: This is what we do to Tom Cruise all day long.

*January 15, 2018*

10:00
JANE DOE 1: Do you not think JDL is going to end up killing this one?
JOHN DOE 3: That I do.


17:14
JOHN DOE 1: You have no idea how fun it is to beat up on somebody from Columbia [University].


20:32
JANE DOE 2: Come on Fabio, don't you wanna kill yourself so we can get way with it?
JOHN DOE 3: Come on, Fabio, you know we have to.